# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

MICHAEL W. McKISSACK,

        Petitioner,

v.                            CASE NO. 05-CV-70579-DT
                                    HONORABLE DENISE PAGE HOOD

JERI-ANN SHERRY,

        Respondent.

_____/

## OPINION AND ORDER DENYING HABEAS CORPUS PETITION

Petitioner Michael W. McKissack has filed *pro se* habeas corpus petition under 28 U.S.C. § 2254. The habeas petition challenges Petitioner's state convictions for armed robbery, assault with intent to rob while armed, and possession of a firearm during the commission of a felony (felony firearm). Because Petitioner's claims do not warrant the writ of habeas corpus, the habeas petition will be denied.

## I. Background

On June 12, 2001, a circuit court jury in Wayne County, Michigan found Petitioner guilty of two counts of armed robbery, Mich. Comp. Laws § 750.529, two counts of assault with intent to rob while armed, Mich. Comp. Laws § 750.89, and one count of felony firearm, Mich. Comp. Laws § 750.227b. The convictions arose from an incident on October 28, 2000, when armed men robbed James Robertson and Becky Meyer and attempted to rob Mr. Robertson's wife Julie and their friend Marilyn Frith. The tourists were walking from their hotel in downtown Detroit to the MGM Grand Casino a few blocks away when the robbery occurred. At a subsequent lineup, Mr. Robertson identified Petitioner as the man who robbed him. None of the women,

however were able to identify anyone in line-ups or at trial. Nevertheless, the jury was persuaded by Mr. Robertson's testimony and convicted Petitioner as charged. The trial court sentenced Petitioner to two years in prison for the felony firearm conviction, followed by concurrent terms of seven to fifteen years for each of the other convictions.

Petitioner raised his habeas claims in an appeal of right. The Michigan Court of Appeals affirmed his convictions in an unpublished *per curiam* opinion. *See People v. McKissack*, No. 237026 (Mich. Ct. App. Aug. 12, 2003). On February 27, 2004, the Michigan Supreme Court denied leave to appeal. *See People v. McKissack*, 469 Mich. 1013; 676 N.W.2d 630 (2004).

Petitioner filed his habeas corpus petition on February 14, 2005. The grounds for relief are: (1) the convictions were against the great weight of the evidence, (2) the prosecutor's misconduct requires a new trial, (3) the bad-faith loss of potentially useful evidence and the failure to instruct the jury that they could draw an adverse inference from the loss of evidence denied Petitioner due process of law, (4) trial counsel provided ineffective assistance, (5) the cumulative effect of errors denied Petitioner his right to a fair trial, and (6) there was insufficient evidence to sustain the convictions. Respondent urges the Court to deny the habeas petition.

## II. Statement of Facts

### A. The Complainants' Testimony

Becky Meyer testified that, on October 28, 2000, she walked from the Best Western Hotel to the MGM Grand Casino with three companions. She heard footsteps behind them. Then Julie Robertson screamed, and everyone stopped. Becky Meyer saw four black men between the ages of twenty to thirty armed with at least three guns. Two of the men stood near James Robertson, while the other two were near the women. One of the men ordered the women

to surrender their purses, while another reached for Becky Meyer's fanny pack, containing $425. The man took the fanny pack and ran to an older, tan-colored van, which may have been a Chevy or a Ford. The two men with James Robertson also ran to the van. Ms. Meyer assumed that all the men left together, but she was not certain what happened to the man with the ladies. Ms. Meyer later retrieved her fanny pack, minus the money and debit cards, from the Police Department.

On cross-examination, Ms. Meyer stated that it was a shocking event, which rattled her and that she did not get the license plate number of the van. She viewed two lineups, with five people in each, but failed to make a positive identification. She claims that she paid attention to James Robertson and the guns, but not the individual interacting with him.

James Robertson testified that he saw four men in a doorway near the People Mover as the group started walking toward the casino. He first saw the men at a distance of twenty feet and then at a distance of ten feet as he walked past them. Petitioner was one of the men. Mrs. Robertson later said that the men were following them, so James let the women go ahead. He heard footsteps and then Petitioner pointed a small caliber handgun at his face. Mr. Robertson faced Petitioner for about five seconds from a distance of about a foot and a half. Nothing covered Petitioner's face, and they were standing under street lights, which were claimed to have been brighter than the courtroom lights. Mr. Robertson looked at Petitioner's face because he wanted to make sure that he knew what the man looked like in case he got out of the situation. Petitioner ordered Mr. Robertson to go to the fence and took his wallet with $47.00 in it. At first, Mr. Robertson thought there was someone else near him, but he was still "fogging" about that at trial. While kneeling at the fence, the gun never left his ear, and Petitioner said, "Cause

me trouble, and I'll shoot your girls." Marilyn Frith and Mrs. Robertson were together, but Becky Meyer was ahead of them closer to the fence. Mr. Robertson could see two men and one had a gun on the women. Meanwhile, Petitioner ordered Mr. Robertson to get on his stomach and kicked him. Then Petitioner and the other men went to a van across the street. A Dodge Ram van pictured in one of the State's exhibits looked just like the van Mr. Robertson saw. Mr. Robertson later picked up his wallet, minus the money and one credit card, from the police three days later. Mr. Robertson viewed two lineups and selected Petitioner at the second lineup. Mr. Robertson later identified Petitioner again at a hearing in district court. There was no doubt in Mr. Robertson's mind that the man who robbed him was Petitioner.

On cross-examination, Mr. Robertson stated that it had been a shocking experience. Although he had expressed uncertainty at the preliminary examination as to who frisked him, he claimed to be sure at trial that it was Petitioner who frisked him. He informed the police that the suspect was a black male, 30 to 35 years old, 5'5" tall, 145 pounds, clean-shaven with a puffy face, and dressed in a dark skullcap, dark scarf, brown waist jacket, and blue jeans. As for the other men, he could only say that they were black men. Mr. Robertson was not specific as to the model or manufacturer of the van, and he was too far away from it to get the license plate number. He could not remember whether he told the police that the man had a scar in his eyebrow. He saw Petitioner at the preliminary examination with a lawyer and at trial with defense counsel. At the first lineup, Mr. Robertson picked Willie Jones, and he could not remember what he said about that person or whether he said he might have been one of the perpetrators of the crimes. Petitioner was about the same size as the other men in the lineup, although a couple of the men were bigger, and one was smaller. Petitioner could have been fifty

pounds heavier than the other men; some of the men also appeared older than Petitioner.

Julia Robertson testified that the men were not very old and that three of them walked a little behind her and her companions, but on the other side of the street. The fourth man split away from the other men. She heard scuffling, and when she turned around, she saw her husband's face pressed against the fence and a man pointing a gun at his head. She could not see the man's face. Two men ran around Mr. Robertson and approached the women. One of them held a gun on Mrs. Robertson and Marilyn Firth and ordered them to hand over their purses. They were not carrying purses and said so. Becky Meyer was off to the side, and a man took her fanny pack. The women were told to shut up and lie down. The men jumped into the passenger side of a van, which then sped off. Mrs. Robertson did not know what happened to the fourth person.

On cross-examination, Mrs. Robertson stated that she did not see the faces of any of the men, but that the man by her husband was about 5'8" to 5'9" tall. She attended two lineups, but did not select anyone and was unable to identify anyone at trial.

Marilyn Frith testified that there was three robbers. She saw two handguns pointed at Mr. Robertson and one handgun pointed at Julie Robertson and herself. She looked briefly at the face of the man who pointed a gun at Mr. Robertson, but she had no recollection of what the man looked like. She had been looking at the guns. She could not identify anyone at the lineups or at trial.

### B. The Police Officers' Testimony

Patrick Tinney was an investigator for the Detroit Police Department. He testified that

three people were arrested in a 1988 brown Dodge van on October 30, 2000. Two of the three were placed in separate lineups. Petitioner was placed in one lineup, and Wayne Grant was placed in the other lineup. The third man needed medical attention and was not put in a lineup. It took James Robertson several seconds to identify Petitioner in position 4.

Wayne Grant was in position number 5 in the other lineup. Mr. Robertson picked the man in position number 3, who was not a suspect, and he said nothing in particular about his selection. None of the women made a positive identification at the lineups. At the crime scene, the police took the following description of a suspect: 30 to 35 years old, 5'5" tall, 145 pounds, clean-shaven, puffy face. The man in position number 5 fit that description, but Mr. Robertson did not choose him.

On cross-examination, Officer Tinney testified that, at the time of the lineup, Petitioner was 20 years old and he wore a slight mustache. The other men in the lineup appeared to be similar in stature to Petitioner, but they indicated that they weighed less than Petitioner, who claimed to be 195 at the time. The man in position number 1 was 160 pounds, number 2 was 130 pounds, number 3 was 142 pounds, and number 5 was 139 pounds. Officer Tinney testified that he would have written itdown if someone who viewed the lineups had said that he could not be sure about his selection.

On redirect examination, Officer Tinney stated that the men in Petitioner's lineup appeared to be about the same height and weight as Petitioner, although one man was heavier and shorter than Petitioner and the other men. Petitioner told the police that he was 5'7" tall, but a photograph of Petitioner in front of a chart depicted him as 5'10".

Police Officer Joseph Peck testified that he took a report from James Robertson at 9:35

p.m. on October 28, 2000. Mr. Robertson described the suspect as a black man, 30 to 35 years old, 5'5", 145 pounds, clean shaven, puffy face, and dressed in a dark cap, dark scarf, brown jacket, and blue jeans. The vehicle used in the robbery was described as a brown, rusty older model van. On cross-examination, Officer Peck stated that no year or manufacturer was given for the van.

The State's final witness was James Kraszewski, the investigator in charge of the case. Officer Kraszewski testified that the victims' fanny pack and wallet were discarded on the street and turned over to the the precinct as found property. He did not ask to have the items tested for fingerprints, because items submitted for fingerprints have to be sterile and not touched by human hands. Fingerprints would have been useless in his opinion, because the items had been handled by a number of officers after they were turned in, and by an unknown number of civilians.

### C. The Defense

Defense counsel moved for a directed verdict of acquittal on the basis of misidentification. Counsel noted that three of the four complainants were unable to identify Petitioner and the fourth complainant identified a "filler" in the first lineup. The trial court denied defense counsel's motion after noting that Mr. Robertson had identified Petitioner and that the issue of identification was a question of fact for the jury.

Petitioner did not testify. He and his attorney indicated that they had discussed the matter and decided for tactical reasons not to present any witnesses. The jury convicted Petitioner as either a principal or an aider and abettor in the robbery of James Robertson and Becky Meyer, and the assault of Julia Robertson and Marilyn Frith with intent to rob them, and of possessing a

firearm during the robberies and assaults.

### D. The Motion for New Trial and Sentencing

Defense counsel moved for a new trial at Petitioner's sentencing. He argued that a miscarriage of justice had occurred and that the trial court should substitute its judgment for the jury's verdict. The trial court did not think it was empowered to do so and denied Petitioner's motion.

After the parties discussed the scoring of the sentencing guidelines, the Reverend Wayne Grant was permitted to speak in Petitioner's behalf. The Reverend stated that Petitioner had lived in his foster care home and that the Reverend, Petitioner, and a mentally impaired person were taken into custody and accused of committing the robbery three days after the robbery occurred. Rev. Grant explained that he was a former public school teacher and he was released from custody after the police determined that he did not have a criminal record. When the trial court asked Rev. Grant whether he knew where Petitioner was at the time of the robbery, Rev. Grant responded that Petitioner lived in his house, that he had tried to communicate with Petitioner's attorney, that he mentioned an alibi and "about ten different points" to defense counsel, but that "we missed some of it." He then stated that Petitioner spent the night of the robbery in his home. He said that he had so informed Petitioner's attorney, but that the two of them had differences of opinion. When the trial court noted that Rev. Grant was vacillating as to whether he had informed Petitioner's attorney of his ability to vouch for Petitioner's presence on the day and time of the robbery, Rev. Grant stated that he had explained to defense counsel that Petitioner lived and worked in his foster care home.

Petitioner stated at the sentencing that he was innocent and had been wrongly convicted.

The trial court repeated that the jury had heard the facts and made a decision. The court then sentenced Petitioner below the sentencing guidelines to imprisonment for a term of seven to fifteen years for the robberies and assaults and to a mandatory consecutive term of two years for the felony firearm conviction.

### III. Standard of Review

Habeas petitioners are entitled to the writ of habeas corpus only if they can show that the state court's adjudication of their claims on the merits–

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court's decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000) (Justice O'Connor's majority opinion on Part II). A state court's decision is an "unreasonable application of" clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id*. at 413.

"[A]n *unreasonable* application of federal law is different from an *incorrect* application

of federal law." *Id*. at 410 (emphasis in original).  "[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Id*. at 409.

> The state-court decision need not refer to relevant Supreme Court cases or even demonstrate an awareness of them. *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam).  Instead, it is sufficient that the result and reasoning are consistent with Supreme Court precedent. *Id*.  A state court moreover does not act contrary to clearly established law when the precedent of the Supreme Court is ambiguous or nonexistent; it may hold a view that is different from [the Sixth Circuit Court of Appeals] or another federal court. *See Mitchell v. Esparza*, 540 U.S. 12, 17 (2003) (per curiam).  Ultimately, AEDPA's highly deferential standard requires that this court give the state-court decision "the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam).

*Slagle v. Bagley*, 457 F.3d 501, 513-14 (6th Cir. 2006), *reh'g en banc denied*, 474 F.3d 923 (6th Cir. 2007).  "Furthermore, state findings of fact are presumed to be correct unless the defendant can rebut the presumption by clear and convincing evidence.  28 U.S.C. §  2254(e)(1)." *Baze v. Parker*, 371 F.3d 310, 318 (6th Cir. 2004), *cert. denied*, 544 U.S. 931 (2005).

## IV.  Discussion

### A.  Weight of the Evidence

Petitioner alleges that his convictions were against the great weight of the evidence.  He points out that three of the four complainants were unable to identify him and that the evidence connecting him to the crime came from the fourth complainant, who selected someone other than a suspect at the first lineup and provided the police with a description that did not accurately depict him.

When Petitioner moved for a new trial on the ground that his convictions were against

the weight of the evidence, the trial court stated that it could not substitute its opinion for the jury's verdict. The court noted that the jury was made aware of the discrepancies in the identification. The Michigan Court of Appeals stated on review of Petitioner's claim that witness credibility was a question for the jury and that the trial court did not abuse its discretion in denying Petitioner's motion for new trial.

Petitioner has not alleged that the pretrial confrontation was unnecessarily suggestive and a violation of his constitutional right to due process. *Cf. Neil v. Biggers*, 409 U.S. 188, 195-200 (1972). He merely alleges that the verdict was against the great weight of evidence because Mr. Robertson's description of him was inaccurate and there was no other evidence linking him to the crimes.

"[I]t is well settled that upon habeas corpus the court will not weigh the evidence, although, if there is an entire lack of evidence to support the accusation, the court may order his discharge." *Hyde v. Shine*, 199 U.S. 62, 84 (1905). The contention that a new trial should be granted because the jury's verdict was against the great weight of the evidence does not raise an issue of federal law. *Nash v. Eberlin*, 437 F.3d 519, 522 (6th Cir. 2006). It raises only a state law issue, which is not a basis for federal habeas relief. *Young v. Kemp*, 760 F.2d 1097, 1105 (11th Cir. 1985); *Ex parte Craig*, 282 F. 138, 148 (2d Cir. 1922); *Garrett v. Perlman*, 438 F. Supp. 2d 467, 470 (S. D. N. Y. 2006).

Because Petitioner's first claim does not allege a violation of his constitutional rights, he is not entitled to habeas relief. "In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2241; *Rose v. Hodges*, 423 U.S. 19, 21 (1975) (per curiam)." *Estelle v. McGuire,*

502 U.S. 62, 68 (1991). "A federal court may not issue the writ [of habeas corpus] on the basis of a perceived error of state law." *Pulley v. Harris*, 465 U.S. 37, 41 (1984).

## B. Sufficiency of the Evidence

Petitioner alleges in a related claim that the evidence was insufficient to support his convictions because the identification evidence was woefully inadequate. A sufficiency-of-the-evidence claim is based on federal due process principles, unlike a weight-of-the-evidence claim, which is a pure state law claim for which habeas review is not available. *Garrett*, 438 F. Supp.2d at 470.

### 1. Legal Framework

"[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). The critical inquiry on habeas review of the sufficiency of the evidence to support a criminal conviction is

> whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt. [T]his inquiry does not require a court to "ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt." Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

*Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979) (internal citation and footnote omitted) (emphasis in original). The *Jackson* standard ordinarily "must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law." *Id.* at 324 n.16. Petitioner, however, is not alleging that the prosecutor failed to establish the elements of the

crimes with which he was charged. The basis for his claim is that James Robertson's identification testimony was not believable.

The Court reviews sufficiency-of-the-evidence claims through the framework of 28 U.S.C. § 2254(d). *Martin v. Mitchell*, 280 F.3d 594, 617 (6th Cir. 2002). Moreover,

> [a] reviewing court does not reweigh the evidence or redetermine the credibility of the witnesses whose demeanor has been observed by the trial court. *Marshall v. Lonberger*, 459 U.S. 422 (1983). It is the province of the factfinder to weigh the probative value of the evidence and resolve any conflicts in testimony. *Neil v. Morris*, 972 F.2d 675, 679 (6th Cir. 1992). An assessment of the credibility of witnesses is generally beyond the scope of federal habeas review of sufficiency of evidence claims. *Gall v. Parker,* 231 F.3d 265, 286 (6th Cir. 2000). The mere existence of sufficient evidence to convict therefore defeats a petitioner's claim. *Ibid.*

*Matthews v. Abramajtys*, 319 F.3d 780, 788-89 (6th Cir. 2003). Stated differently, the Court must defer to the factfinder's "credibility determinations and resolutions of conflicts in testimony, weight accorded to evidence, and reasonable inferences drawn from the basic facts to reach ultimate factual conclusions." *Caldwell v. Russell*, 181 F.3d 731, 738 n. 6 (6th Cir. 1999), *abrogated on other grounds as explained in Mackey v. Dutton*, 217 F.3d 399, 406 (6th Cir. 2000).

### 2. Analysis

The Michigan Court of Appeals concluded that the evidence was legally sufficient to support Petitioner's convictions. The court of appeals stated that the credibility of Mr. Robertson's testimony was a matter for the jury to resolve. This Court agrees. "As long as there is not a substantial likelihood of misidentification, it is the function of the jury to determine the ultimate weight to be given the identification." *Summit v. Bordenkircher*, 608 F.2d 247, 253 (6th

Cir. 1979).

Mr. Robertson's identification was not so improbable that it can be said there was a substantial likelihood of misidentification. Mr. Robertson had a good opportunity to view the robber because the robber stood about a foot and a half away from him, he was not wearing a mask, and the lighting was very good. Robertson focused his attention on the robber so that he could identify him at a later time.

It is true that Robertson's description of the robber's age, height, and weight differed from Petitioner's actual age, height, and weight. Mr. Robertson described Petitioner as being 30 to 35 years old when he was really 20 years old at the time. Becky Meyer, however, testified that the men were between 20 and 30 years old.

Mr. Robertson described the robber as 5'5", whereas Petitioner told the police that he was 5'7". Mrs. Robertson, however, testified that the man by her husband could have been 5'8" tall.

Mr. Robertson described the robber as being 145 pounds. This was considerably less than the 195 pounds that Petitioner said he weighed at the time of the arrest. Officer Tinney, however, testified that Petitioner appeared to be about the same weight as the other men in the lineup with him and those men weighed between 130 and 160 pounds.

Any shortcomings in Mr. Robertson's identification went more to the weight of the evidence than to the reliability of the identification and, thus, were issues for the jury. *United States v. Brownlee*, 454 F.3d 131, 140 (3d Cir. 2006). The jury could have concluded that Mr. Robertson focused on Petitioner's face and that his identification of Petitioner at the lineup was persuasive despite the discrepancies in his description of the suspect's weight and height. The

jury might have been influenced by the fact that Mr. Robertson selected Petitioner within seconds of viewing the second lineup, which occurred only three days after the robbery. Mr. Robertson explained his misidentification at the first lineup by stating that he had said the person might look a little bit like the person that held a gun on him, but he would not bank on it. Mr. Robertson was certain at trial that he picked the correct person. His identification of Petitioner was bolstered by the fact that Petitioner was arrested in a vehicle like the one used in the robbery.

To summarize, using the words of the Michigan Court of Appeals,

the discrepancies between James Robertson's description of the robber and defendant's physical characteristics [were] not so significant that they render[ed] his identification testimony inherently implausible. The jury might have reasonably concluded that Robertson was able to recognize the robber's face, even if he erred in visually assessing the robber' s weight, height, and age. This conclusion was consistent with Robertson's testimony that he got a good look at the robber's face, and Officer Tinney's testimony that Robertson unhesitatingly picked defendant out in the lineup. Tinney also testified that, although the participants' weights varied across a sixty-five pound range, they all appeared about the same size. The jurors were able to see defendant and determine whether his appearance was utterly inconsistent with Robertson's description. [C]ommonsense explanations could reconcile an accurate identification with the alleged discrepancies between Robertson's verbal description and defendant's physical characteristics . . . .

*McKissack*, Mich. Ct. App. No. 237026, at 2.

A rational juror viewing the evidence in the light most favorable to the prosecution could have determined from Robertson's testimony that Petitioner robbed him and that the prosecution proved its case beyond a reasonable doubt. "The testimony of one eyewitness is sufficient to prove the identity of a perpetrator of a crime, even if that witness' testimony is contested." *Morris v. California*, 36 Fed. Appx. 235, 238 (9th Cir. 2002) (citing *United States v. Smith,* 563

F.2d 1361, 1363 (9th Cir. 1977)). Therefore, the state court's finding that the evidence was sufficient to support Petitioner's convictions did not result in an unreasonable application of *Jackson*.

## C. The Prosecutor's Conduct

Petitioner alleges next that prosecutorial misconduct during closing arguments requires a new trial. Respondent argues that this claim is procedurally defaulted.

### 1. Procedural Default

A procedural default is "a critical failure to comply with state procedural law. . . ." *Trest v. Cain*, 522 U.S. 87, 89 (1997). Federal courts may not consider procedurally defaulted claims unless "the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

The state procedural rule in question here is Michigan's contemporaneous-objection rule, which requires defendants to make a timely and specific objection at trial to preserve a claim for appellate review. *See People v. Carines*, 460 Mich. 750, 761-64; 597 N.W.2d 130, 137-38 (1999); *People v. Grant*, 445 Mich. 535, 546; 520 N.W.2d 123, 128 (1994). Petitioner violated this rule by not objecting to the prosecutor's conduct during trial. The Michigan Court of Appeals enforced the rule by reviewing Petitioner's claim for plain error because he failed to object to the prosecutor's conduct during trial. A state appellate court's review for plain error constitutes enforcement of a state procedural rule. *Hinkle v. Randle*, 271 F.3d 239, 244 (6th Cir. 2001).

The contemporaneous-objection rule was an adequate and independent state ground for denying relief because it was firmly established and regularly followed before Petitioner's trial. Therefore, in order for this Court to consider the substantive merits of Petitioner's procedurally defaulted claim, he must establish "cause and prejudice" or a "miscarriage of justice."

## 2. Cause

Petitioner alleges that his trial attorney should have objected to the prosecutor's remarks. "Constitutionally '[i]neffective assistance of counsel . . . is cause for a procedural default.'" *Joseph v. Coyle*, 469 F.3d 441, 459 (6th Cir. 2006) (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986)), *petition for cert. filed*, (U.S. Jan. 5, 2007) (No. 06-961). However, to prove ineffective assistance of counsel under the Sixth Amendment, Petitioner must demonstrate that his attorney's performance was deficient and that the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). An attorney's failure to make a contemporaneous objection to prosecutorial misconduct

> constitutes defective performance when that failure is due to clear inexperience or lack of knowledge of controlling law, rather than reasonable trial strategy. *See, e.g., Gravely v. Mills*, 87 F.3d 779, 785-86 (6th Cir. 1996); *Rachel v. Bordenkircher*, 590 F.2d 200, 204 (6th Cir. 1978).

> [E]ven if counsel's performance is deemed deficient, a defendant must show that those deficiencies were prejudicial to the defense. *See Strickland*, 466 U.S. at 692. To make this showing, the defendant must demonstrate that there "is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. at 694.

*Washington v. Hofbauer,* 228 F.3d 689, 702 (6th Cir. 2000). The Court will briefly review Petitioner's arguments about the remarks of the prosecutor in order to determine whether defense

counsel was ineffective for failing to object to the remarks.

### a. Vouching

Petitioner asserts that the prosecutor vouched for prosecution witness James Robertson when she stressed Robertson's identification. The Sixth Circuit has explained that

> [i]mproper vouching occurs when a prosecutor supports the credibility of a witness by indicating a personal belief in the witness's credibility thereby placing the prestige of the office of the [prosecutor] behind that witness. *See, e.g., Taylor v. United States,* 985 F.2d 844, 846 (6th Cir. 1993); *United States v. Martinez,* 981 F.2d 867, 871 (6th Cir. 1992). Generally, improper vouching involves either blunt comments, *see, e.g., United States v. Kerr,* 981 F.2d 1050, 1053 (9th Cir. 1992) (stating that improper vouching occurred when prosecutor asserted own belief in witness's credibility through comments including "I think he [the witness] was candid. I think he is honest."), or comments that imply that the prosecutor has special knowledge of facts not in front of the jury or of the credibility and truthfulness of witnesses and their testimony, *see, e.g.,* [*United States v.*]*Carroll,* 26 F.3d [1380, 1388 (6th Cir. 1994)] (stating that improper vouching occurred when prosecutor argued that the witness testifying under a plea agreement was in jeopardy if the court or government did not find the testimony truthful).

*United States v. Francis*, 170 F.3d 546, 550 (6th Cir. 1999).

The disputed comments in this case read:

> There was no doubt from that stand. There was no doubt at the lineup. And I submit to you that this was a good I.D. and I submit to you that the defendant is the one who was involved in taking these items and trying to rob the other two complainants and ask that you find the defendant guilty.

(Tr. June 12, 2001, at 54).

To the extent that the prosecutor was suggesting that she believed Petitioner was guilty and that Mr. Robertson accurately identified Petitioner as the robber, her remark was improper. The essence of the remarks, however, was that Mr. Robertson was certain of his identification of

Petitioner as the man who robbed him. The remark that the identification was a good one was a brief and isolated comment, which flowed from valid observations that Mr. Robertson was sure about his identification.

Defense counsel attempted to refute the prosecutor's remarks with his own closing argument, which followed immediately after the remarks quoted above. Counsel argued that there were multiple reasons to doubt Mr. Robertson's identification testimony. Counsel's closing argument was as effective as any objection would have been, and may be properly deemed a strategic tactical decision. Therefore, the failure to object to the prosecutor's alleged vouching did not amount to deficient performance.

### b. Facts not in Evidence

Petitioner asserts that the prosecutor relied on facts not in evidence when she stated that James Robertson's identification of Petitioner reflected the beliefs of the other witnesses. The actual comment in context reads:

> And I submit to you in this case Mr. Robertson has told you that he is sure in this and he has identified the defendant quickly in the lineup here in court. He has no doubt and he was the person in a position in order to do it. The only person in a position who could do it, because the ladies were just too far away. Because he was the only person in a position to identify him he is the only person who does identify and that's the only reason. And I submit to you, ladies and gentlemen *that his I.D. is their belief* and ask you to find the defendant guilty.

(*Id*. at 71) (emphasis added).

Stating that the three female complainants adopted James Robertson's identification as their own was an improper comment, because there was no evidence supporting the comment.

Prosecutors may not misrepresent evidence, *Donnelly v. DeChristoforo*, 416 U.S. 637, 646

(1974); *Berger v. United States*, 295 U.S. 78, 84 (1935); *Hodge v. Hurley*, 426 F.3d 368, 380-81 (6th Cir. 2005), or assert facts that were never admitted in evidence, *Washington v. Hofbauer,* 228 F.3d at 700.

The comment, however, was another brief and isolated remark. It likely did not mislead the jury, because the female complainants unequivocally testified that they were unable to identify the men who assaulted and robbed them.

Even if the failure to object amounted to deficient performance, the deficiency did not prejudice the defense, because the trial court instructed the jurors before and after closing arguments that the attorneys' comments and arguments were not evidence. (Tr. June 12, 2001, at 43 and 75.) The court explained that the lawyers' statements and arguments were meant only to help the jurors understand the evidence and their theories. (*Id.* at 75). "[T]he prejudicial effect of improper comments may be negated by curative instructions to the jury." *United States v. Roberts*, 986 F.2d 1026, 1031 (6th Cir. 1993). "[J]uries are presumed to follow their instructions." *Marsh v. Richardson*, 481 U.S. 200, 211 (1987).

### c. Disparaging the Defense

Petitioner asserts that the prosecutor disparaged defense counsel and the entire defense by repeatedly telling the jurors that the defense was trying to mislead them and that defense counsel's closing argument was a "red herring." Prosecutors may not "make unfounded and inflammatory attacks on the opposing advocate," *United States v. Young*, 470 U.S. 1, 9 (1985), but Petitioner exaggerates when he says that the prosecutor repeatedly told the jurors that defense counsel was trying to mislead them. The prosecutor's closing argument focused entirely on the evidence. (Tr. June 12, 2001, at 44-54). Defense counsel subsequently argued that there

was no physical evidence, such as fingerprints, to corroborate Mr. Robertson's identification of Petitioner as the robber and that no one even checked for fingerprints. (*Id*. at 62-63 and 66). In her rebuttal, the prosecutor once again addressed the evidence and responded to defense counsel's argument about the lack of fingerprints as follows:

> The question about the fanny pack and the wallet and its contents were not fingerprinted. *Red herring, ladies and gentlemen, red herring.* You have an officer, an experienced detective who has testified here and told that these were items that to his knowledge were picked up off the street and were handed in. And the argument was made to you that he assumed they had been touched. The testimony I submit to you was that he said he knew of at least three police officers who had handled this item. Did you expect to see to get any kind of print off there? No, they weren't preserved for prints. *Don't let the red herring lead you to what you need to focus on, and that is the question of the identification.*

(Tr. June 12, 2001, at 70-71) (emphases added).

A prosecutor's description of defense counsel's argument as a red herring, a smoke screen, or a distraction is not *per se* improper. *See United States v. Bernard*, 299 F.3d 467, 487-88 (5th Cir. 2002); *United States v. Rivera*, 971 F.2d 876, 883 (2d Cir. 1992). Such arguments can be reversible error when the prosecutor makes "personal, unsubstantiated attacks on the character and ethics of opposing counsel" and accuses defense counsel of conspiring with the defendant to fabricate testimony. *See United States v. Holmes*, 413 F.3d 770, 775 (8th Cir. 2005). There were no personal attacks on defense counsel at Petitioner's trial and, contrary to Petitioner's contention, the prosecutor did not evince a studied purpose to prejudice the jury. Therefore, counsel's failure to object to the "red herring" remarks did not amount to deficient performance.

### d. Summary

Defense counsel's performance was not deficient and did not prejudice the defense. Petitioner, therefore, has not met the *Strickland* standard. Because he has failed to show that his attorney was constitutionally ineffective, he cannot rely on ineffective assistance of trial counsel as "cause" to excuse his procedural default. "When a petitioner fails to establish cause to excuse a procedural default, a court does not need to address the issue of prejudice." *Simpson v. Jones*, 238 F.3d 399, 408 (6th Cir. 2000) (citing *Long v. McKeen*, 722 F.2d 286, 289 (6th Cir. 1983)).

### 3. Miscarriage of Justice

The remaining question is whether the Court's failure to consider the substantive merits of Petitioner's defaulted claim about the prosecutor will result in a miscarriage of justice. This narrow exception to the general rule requires the habeas applicant to demonstrate that the alleged constitutional error has probably resulted in the conviction of one who is actually innocent of the underlying offense. *Dretke v. Haley*, 541 U.S. 386, 388 (2004); *Carrier*, 477 U.S. at 496. "To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him in the light of . . . new evidence." *Schlup v. Delo*, 513 U.S. 298, 327 (1995).

Petitioner has not supported his claims with any new evidence of actual innocence. Accordingly, a miscarriage of justice will not occur as a result of the Court's decision not to adjudicate the substantive merits of Petitioner's procedurally defaulted claim.

### D. The Lack of Fingerprint Evidence

Petitioner contends that the police should have checked the stolen items for fingerprints. According to him, the police intentionally suppressed the evidence because they did not want to

risk generating a fingerprint analysis that would be useful to the defense. Petitioner claims in the alternative that the trial court should have instructed the jurors to draw an inference adverse to the State from the spoliation of evidence. Petitioner also alleges that his attorney should have objected to the loss of fingerprint evidence by the police.

The Michigan Court of Appeals reviewed Petitioner's claims about destroyed evidence on the merits even though the court stated that they were subject to "plain error" analysis due to Petitioner's failure to raise the issues in the trial court. The court of appeals opined that the police did not act in bad faith and that a fingerprint analysis would have had minimal value. The court of appeals also stated that there was no basis for providing an adverse inference jury instruction with regard to the stolen items.

### 1. Failure to Preserve Evidence

The Due Process Clause of the Fourteenth Amendment to the United States Constitution does not require law enforcement agencies to use a particular investigatory tool, *Arizona v. Youngblood*, 488 U.S. 51, 58-59 (1988), or to preserve evidence in order that the evidence may be introduced at trial. *California v. Trombetta*, 467 U.S. 479, 491 (1984). "[U]nless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Youngblood*, 488 U.S. at 58.

Petitioner has failed to show that the police acted in bad faith. Officer James Kraszewski testified that the fanny pack and wallet were discovered on the street and turned into the precinct as found property. Officer Kraszewski did not ask to have the items to be tested for fingerprints because the items had been handled by at least three police officers and by an unknown number of civilians. He claimed that the items did not hold prints well and that any prints, which might

have been preserved, were destroyed in the handling. (Tr. June 12, 2001, at 30-33.) The record contains no contradictory evidence that the police acted in bad faith.

Petitioner also has failed to show that the lost evidence was "materially exculpatory" evidence as opposed to "potentially useful" evidence. *Illinois v. Fisher*, 540 U.S. 544, 549 (2004).

> Whatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense. To meet this standard of constitutional materiality, evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.

*Trombetta*, 467 U.S. at 488-89 (footnote and internal citation omitted).

The absence of Petitioner's fingerprints on the stolen items would not have ruled out the possibility that he participated in the robbery. As the Michigan Court of Appeals recognized,

> [t]he absence of his prints on the items would have had only minimal value as exculpatory evidence. Another robber took Becky Meyer's fanny pack, and thus, there was no evidence that defendant ever touched it. Kraszewski's unrebutted testimony established that there was little likelihood of the robber leaving a lasting and identifiable print on the wallet or its contents; hence, the absence of defendant's print would not have proved anything. Logically, there was no way that examining these items could have helped defendant. The presence of defendant's prints would have bolstered the prosecution's case with objective physical evidence, and the absence of his prints or presence of other prints would have neither weakened the prosecution's case nor strengthened defendant's defense.

*McKissack*, Mich. Ct. App. No. 237026, at 4.

In conclusion, Petitioner has failed to show that the police acted in bad faith and that the fingerprint evidence would have been materially exculpatory. Consequently, he was not

deprived him of due process, and his attorney was not ineffective for failing to object to the loss of evidence.

## 2. Adverse Jury Instruction

Petitioner alleges that the trial court should have instructed the jurors *sua sponte* that they could draw an inference adverse to the State from the failure to test for, and preserve, fingerprint evidence. The Michigan Court of Appeals stated on review of this claim that there was no basis for the trial court to instruct the jury in this manner. This Court agrees.

In Michigan, a party is entitled to an adverse inference instruction when material evidence in control of the opposing party is not produced at trial. *People v. Cress*, 250 Mich. App. 110, 157 n.27; 645 N.W.2d 669, 694 n.27 (2002), *reversed on other grounds*, 466 Mich. 883; 646 N.W.2d 469 (2002) (table). The instruction should state:

> that the jury may infer that the destroyed evidence would have been adverse to the prosecution if it finds that (1) the government acted in bad faith in failing to preserve the evidence, (2) the exculpatory value of the evidence was apparent before its destruction, and (3) the nature of the evidence was such that the defendant would be unable to obtain comparable evidence by other reasonably available means.

*Id.*, 250 Mich. App. at 158; 645 N.W.2d at 695. Because the inference is permissive and not mandatory, the jury is not required to make the inference. *Brenner v. Kolk*, 226 Mich. App. 149, 155-56; 573 N.W.2d 65, 68 (1997).

Here, there was no evidence that the prosecution acted in bad faith or that the items contained obvious exculpatory value. Therefore, an adverse jury instruction would have been inappropriate.

## E.  Assistance of Counsel

Petitioner alleges that his trial attorney should have (1) sought appointment of an expert witness on eyewitness identification and (2) requested detailed jury instructions on the dangers of eyewitness identification and cross-racial identification.  As previously explained, the test for ineffective assistance of counsel has two components:  "First, the defendant must show that counsel's performance was deficient. . .Second, the defendant must show that the deficient performance prejudiced the defense."  *Strickland,* 466 U.S. at 687.

An attorney's performance is deficient if "counsel's representation fell below an objective standard of reasonableness."  *Id.* at 688.  The defendant must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  *Id*. at 687.  "Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'"  *Id*. at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).

An attorney's deficient performance is prejudicial if "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."  *Id*. at 687.  The defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id*. at 694.

"[T]he prejudice inquiry is not the same as the sufficiency of the evidence analysis," *Richey v. Mitchell*, 395 F.3d 660, 687 (6th Cir.), *overruled on other grounds sub nom Bradshaw*

*v. Richey*, 546 U.S. 74 (2005), and the test is not whether the jury would have reached the same result if it had heard all the evidence. *Rompilla v. Beard*, 543 U.S. 374, 393 (2005). Instead, the Court must ask whether the evidence which was not submitted might have influenced the jury's appraisal of the petitioner's culpability. *Id*. The likelihood of a different result if the evidence had gone must be sufficient to undermine the Court's confidence in the outcome actually reached. *Id*.

### 1. Failure to Request an Expert Witness

Petitioner claims that his trial attorney should have asked the trial court to appoint an expert witness on identification testimony. Petitioner asserts that an expert witness would have shown that (1) witnesses often overestimate the duration of their observation of an individual, (2) a witness's confidence in his identification bears little or no relationship to the accuracy of the identification, (3) memory fades at a geometric rate, (4) post-event phenomena can affect memory and memory is easily distorted, (5) Mr. Robertson may have mistakenly identified Petitioner at trial because he had already identified him in a lineup, and (6) there are psychological pressures on witnesses to identify someone. Petitioner claims that the lack of an expert on identification prevented him from highlighting the grave problems of misidentification.

In Michigan, a defendant is entitled to the appointment of an expert at public expense if he or she cannot proceed safely to trial without the proposed witness. Mich. Comp. Laws § 775.15; *People v. Lueth*, 253 Mich. App. 670; 688; 660 N.W.2d 322, 334-35 (2002). The Michigan Court of Appeals disagreed with Petitioner's claim that his attorney should have sought appointment of an expert witness. It stated that psychological studies on identification error and case histories involving mistaken identification do not indicate that expert testimony is

an indispensable means of alerting the jury to the potential for erroneous identification. The court of appeals also stated that defense counsel may have been concerned about the jury reacting negatively to possibly lengthy expert testimony on the obvious conclusion that people's memories and perceptions sometimes are inaccurate.

Petitioner had no constitutional right to an expert witness on eyewitness identification, *Buell v. Mitchell*, 274 F.3d 337, 359 (6th Cir. 2001) (citing *Moore v. Tate*, 882 F.2d 1107, 1110 (6th Cir. 1989)), but it is a "scientifically and judicially recognized fact that there are serious limitations on the reliability of eyewitness identification of defendants" and "that a significant number of innocent people have been convicted of crimes they did not commit . . . ." *People v. Anderson*, 389 Mich. 155, 172; 205 N.W.2d 461, 468 (1973), *overruled on other grounds by People v. Hickman*, 470 Mich. 602; 684 N.W.2d 267 (2004). "The vagaries of eyewitness identification are well-known; the annals of criminal law are rife with instances of mistaken identification." *United States v. Wade*, 388 U.S. 218, 228 (1967). "Expert testimony has been proven to improve juror knowledge, sensitize jurors to witnessing and identification factors, and desensitize them toward witness confidence." Brooke Whisonant Patterson, *The 'Tyranny of the Eyewitness,'* 28 Law & Psychol. Rev. 195, 202 n.77 (Spring 2004). For the following reasons, however, the Court does not believe that defense counsel was ineffective for not seeking appointment of an expert witness on identification.

### a. Defense Counsel's Efforts to Undermine Robertson's Identification

Petitioner's attorney cross-examined the three female complainants regarding their inability to make an identification at the two line-ups. Defense counsel also elicited testimony that Ms. Meyer and James Robertson did not acquire the license plate number for the van in

which the robbers escaped.  Defense counsel elicited testimony from all the complainants that the experience was a shocking and frightening one.

Defense counsel also cross-examined James Robertson and the police officers regarding Robertson's description of the suspect and Petitioner's actual appearance shortly after the robbery.  Defense counsel pointed out that Petitioner was seated by an attorney when Robertson identified him at the preliminary examination and at trial.

Counsel brought out the fact that Mr. Robertson picked someone who was not a suspect at the first line-up and that he could not remember what he said about the person.  Defense counsel elicited testimony from Officer Tinney that Tinney would have recorded any comments expressing uncertainty about the identification.

In his closing argument, defense counsel agreed with the prosecutor that the issue was identification.  Counsel pointed out the discrepancy between Petitioner's appearance at the time of his arrest and the description of the suspect that Robertson provided to the police.  Counsel also emphasized Mr. Robertson's mistaken identification at the first lineup and the lack of corroborating evidence.  Defense counsel maintained that the case was filled with reasonable doubt and that the jurors should consider the complainants' state of mind at the time of the offense, the inaccurate description given by Mr. Robertson, the misidentification by Mr. Robertson at the first lineup, and the fact that no one else could identify Petitioner.

### b.  Summary

Defense counsel's failure to request an expert witness did not deprive Petitioner of a substantial defense, because counsel attacked James Robertson's identification through cross-

examination and argument.  In addition, Petitioner had the benefit of jury instructions on witness credibility and on identification, which alerted the jury to the problems with identification testimony.  The jury was made aware of discrepancies in the identification of the suspect and Mr. Robertson's misidentification of a man at the first line-up.   In light of Robertson's unwavering testimony that Petitioner was the man who robbed him, an expert witness on identification likely would have had little additional impact on the trial and would not have influenced the jury's appraisal of Petitioner's culpability.  Defense counsel's failure to seek appointment of an expert witness does not undermine the Court's confidence in the outcome of the case.

## 2.  Failure to Request a Jury Instruction

Petitioner asserts that his attorney should have requested detailed jury instructions on the danger of eyewitness misidentification and on the problems with cross-racial identification. Petitioner maintains that his defense would have been enhanced by a jury instruction stating that

> there are serious problems concerning the accuracy of eyewitness identification and . . . real prospects for error inhere in the very process of identification completely independent of the subjective accuracy, completeness or good faith of witnesses.

*Anderson*, 389 Mich. at 180; 205 N.W.2d at 472.

Defense counsel requested the standard jury instruction on identification (Tr. June 12, 2001, at 36), and although the trial court did not instruct on cross-racial identification, it did instruct the jurors on factors to be considered when evaluating a witness's identification.  The court stated that "[t]he prosecutor must prove beyond a reasonable doubt that the crimes were committed and that the defendant was the person who committed the crimes."  (*Id*. at 90-91.)

The court went on to say:

> In deciding how dependable an identification is think about such things as how good a chance the witness has to see the offender at that time, how long the person was watching, whether the witness has seen or known the defendant before, how far away the witness was, whether the area was well lighted and the witnesses state of mind at that time.

> Also think about the circumstances at the time of the identification such as how much time had passed since the crime, how sure the witness was about the identification, and the witnesses state of mind during the identification. You may also consider any time that the witness failed to identify the defendant or made an identification or gave a description and did not agree with his identification of the defendant during the trial.

> You should examine the witnesses identification testimony carefully. You may consider whether other evidence supports the identification because then it may be more reliable. However, you may use the identification testimony alone to convict the defendant as long as you believe the testimony and you find that if proved beyond a reasonable doubt that the defendant was the person who committed the crime or crimes.

(*Id*. at 90-92.)

The trial court also instructed the jurors on how to judge the credibility of witnesses. Among the factors that the court suggested for weighing a witness' testimony were: whether the person was able to see and hear clearly; the length of time that the person was watching; whether anything distracted the witness; whether the witness seemed to have a good memory; how the witness looked and acted while testifying; whether the witness seemed to be making an honest effort to tell the truth; the witness's age, maturity, bias, prejudice, or personal interest in the case; any special reason that the witness had to lie or to tell the truth; and prior inconsistent statements. The court stated that the jurors could choose not to accept anything that a witness said or that they could accept some things and ignore the rest. (*Id*. at 77-79).

The instructions as a whole adequately informed the jurors of the dangers of identification testimony. The instructions were sufficient to protect Petitioner's rights in that they provided guidelines for evaluating James Robertson's credibility and the reliability of his identification of Petitioner. Additional jury instructions on cross-racial identification likely would not have changed the outcome of the proceeding. The jurors obviously believed Mr. Robertson despite the discrepancies in his description of the suspect and despite his misidentification at the first lineup.

For all these reasons, defense counsel's performance was not deficient and the allegedly deficient performance did not prejudice the defense. Defense counsel was not ineffective for failing to request additional jury instructions on the dangers of eyewitness identification and cross-racial identification. The state court's conclusion did not lead to a decision that was contrary to, or an unreasonable application of, *Strickland.*

## F. Cumulative Effect of Errors

Petitioner's final claim alleges that the cumulative effect of the errors deprived him of due process. Constitutional errors that would not individually support habeas relief cannot be cumulated to support habeas relief. *Moore v. Parker*, 425 F.3d 250, 256 (6th Cir. 2005). Consequently, Petitioner is not entitled to habeas relief on the ground that the alleged errors at trial, when cumulated, require reversal of his convictions.

## V. Conclusion

Petitioner's claim of prosecutorial misconduct is procedurally defaulted. The other claims lack merit, because the state appellate court's decision was not contrary to, or an unreasonable

application of, Supreme Court precedent.  Accordingly, the habeas petition is DENIED.


                                        S/Denise Page Hood
                                        Denise Page Hood
                                        United States District Judge

Dated:  February 29, 2008

        I hereby certify that a copy of the foregoing document was served upon counsel of record
and Michael W. McKissack, Reg. No. 338577, Chippewa Correctional Facility, 4269 W. M-80,
Kincheloe, MI 49784 on February 29, 2008, by electronic and/or ordinary mail.

                                        S/William F. Lewis
                                        Case Manager